**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| **WEIRTON AREA WATER BOARD** and **CITY OF WEIRTON**, | Civil Action No. 5:20-CV-102 (Bailey) |
| Plaintiffs, | |
| v. | |
| **3M COMPANY, E. I. DUPONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, ARKEMA, INC., BASF CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC. CLARIANT CORPORATION, DAIKIN AMERICA, INC., DEEPWATER CHEMICALS, INC., TYCO FIRE PRODUCTS L.P., ARCELORMITTAL WEIRTON LLC, and NEO INDUSTRIES (WEIRTON), INC.,** | |
| Defendants. | |

**AMENDED COMPLAINT**

COME NOW your Plaintiffs, the Weirton Area Water Board and the City of Weirton, by and through their undersigned attorneys, Fitzsimons Law Firm PLLC, and for their Complaint against the above-named Defendants, allege and state as follows:

**NATURE OF THE ACTION AND PARTIES**

1.      Plaintiff, The City of Weirton, is a municipal corporation duly organized and existing by virtue of the laws of the State of West Virginia, with its principal place of business in Weirton, West Virginia.

2.      Plaintiff, Weirton Area Water Board, is a governmental entity and/or an agency of the City of Weirton, with its principal place of business in Weirton, Brooke County, West Virginia.

3.      Plaintiffs own and operate a public water system that serves Weirton and the surrounding areas of West Virginia, including Brooke County, West Virginia (the "Weirton Water System"), and Plaintiffs are responsible for the supervision, management, control and operation of the Weirton Water System.

4.      The Weirton Water System consists of water sources, treatment facilities and related equipment, and water delivery systems, all located in Brooke and Hancock Counties, West Virginia.

5.      Plaintiffs are required and/or are responsible to produce and deliver through the Weirton Water System to the residents of Brooke and Hancock Counties, West Virginia safe, clean and high-quality water that meets all applicable standards.

6.      Plaintiffs have owned and operated the Weirton Water System for more than seventy (70) years and have been serving more than nine thousand six hundred (9,600) customers, of which approximately eight thousand six hundred (8,600) are residential, six hundred fifty (650) are commercial, forty-five (45) are industrial and thirty (30) are public authorities.

7.      The Weirton Water System has been contaminated with per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

8.      PFOS and PFOA are fluorosurfactants that repel oil, grease, and water.

9.      PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for

fighting Class B fires.  Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

10.     PFAS are toxic, manmade chemicals which pose serious health risks to humans and animals.

11.     Human exposure to PFAS is associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions.

12.     Defendants, 3M COMPANY, E. I. DUPONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, ARKEMA, INC., BASF CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC., CLARIANT CORPORATION, DAIKIN AMERICA, INC., DEEPWATER CHEMICALS, INC., and TYCO FIRE PRODUCTS L.P.  ("Manufacturing Defendants") designed, developed, manufactured, marketed, and sold PFAS and/or products containing PFAS, including AFFF, throughout the United States, including in West Virginia.

13.     The Manufacturing Defendants knew or should have known that, in the course of normal and/or anticipated transportation, storage, use and disposal of the above chemicals, they would enter the surface and groundwater in West Virginia, including the  Ohio River and the watershed from which Plaintiffs obtain their drinking water supplies.

14.     Defendants, ARCELORMITTAL WEIRTON LLC and NEO INDUSTRIES (WEIRTON), INC. ("Facility Defendants") own and/or operate facilities which are located in Weirton, in close proximity to the supply well and the Ohio River intake for Plaintiffs' water system.

15.     The Facility Defendants used, stored, distributed and/or discharged PFAS and/or products containing PFAS, including AFFF, in their operations and caused the release of these chemicals into the surrounding soil, surface water and groundwater in and around their facilities.

16.     The term "Defendant" or "Defendants" refers collectively to all Manufacturing Defendants and Facility Defendants named herein jointly and severally.  The Defendants include any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, and organizational unities of any kind, their predecessors, successors, and assigns, and their present officers, directors, employees, agents, representatives, and any other person acting on their behalf.

17.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

18.     The Defendants knew or should have known that their operations would cause PFAS and/or products containing PFAS, including AFFF, to be discharged into the environment and inevitably contaminate surface water and groundwater drinking supplies, including within the Weirton Area watershed.

19.     As a direct result of Defendants' tortious actions and omissions, the Weirton Water System has been contaminated with toxic PFAS chemicals.

20.     Plaintiffs bring this action to recover their damages and costs incurred and to be incurred in investigating, monitoring, remediating, and otherwise responding to the contamination of the Weirton Water System with PFAS.

21.     Plaintiffs should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.

22.     Defendant 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M Company") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55144.

23.     3M Company manufactures a wide array of products, including fluorochemicals.

24.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805.

25.     DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

26.     After the dangers of PFAS began to be publicized, DuPont announced its intention to spin off its Performance Chemicals business, which manufactured products using PFAS, into a new publicly traded company called The Chemours Company. The spinoff to DuPont shareholders was completed on July 1, 2015.

27.     As part of the above transactions, The Chemours Company assumed the operations, assets, and certain liabilities of DuPont's Performance Chemicals business.

28.     Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

29.     Chemours is a successor in interest to DuPont Chemical, as described above.

30.     Defendant The Chemours Company FC LLC ("Chemours FC") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

31.     Chemours FC is a successor in interest to DuPont Chemical, as described above.

32.     Collectively, defendants E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC are referred to herein as the "Dupont Defendants".

33. Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

34.     Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("New DuPont") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

35.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

36.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

37.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours and Company.

38.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

39.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines

following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

40.     Arkema Inc. is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

41.     Arkema Inc. develops and manufactures specialty chemicals and polymers.

42.     Arkema, Inc. is a wholly owned subsidiary of Arkema Delaware, Inc. and is indirectly owned by  Arkema France, S.A., a foreign corporation based in Colombes, France.

43.     Arkema, Inc.'s predecessors in interest include Atofina, Atofina Chemicals and TotalFina S.A.

44.     Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

45.     BASF claims to be the second largest producer and marketer of chemicals and related products in North America.

46.     BASF is an affiliate of BASF SE, a foreign corporation based in Ludwigshafen, Germany.

47.     On information and belief, BASF Corporation is the successor in interest to Ciba, Inc., a Swiss specialty chemicals company, including its affiliate or subsidiary, Ciba Specialty Chemicals Corporation.  BASF Corporation is also a successor in interest to Ciba-Geigy Corp.

48.     Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 2 Stanton Street, Marinette, WI 54143.

49.     ChemDesign Products, Inc. f/k/a ChemDesign Group manufactures specialty chemical products.

50.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

51.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

52.     Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

53.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

54.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of Texas, having its principal place of business at One Stanton Street, Marinette, WI 54143.

55.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contains PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

56.     Upon information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

57.     Upon information and belief, Tyco International Ltd. merged into its subsidiary Tyco International plc in 2014 to change its jurisdiction of incorporation from Switzerland to Ireland.

58.     Upon information and belief, Defendants Tyco and Chemguard became subsidiaries of Johnson Controls International, plc ("JCI"), an Irish corporation, when JCI merged with Tyco International plc in 2016.

59.     On information and belief, Chemguard sold AFFF products to one or more industrial facilities in Weirton, West Virginia.  Upon information and belief, the sales occurred sometime between 2015 and 2018.

60.     Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

61.     On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, Inc. Clariant is a wholly owned subsidiary of Clariant AG.

62.     Clariant manufactures specialty chemicals, including fluorochemicals.

63.     Daikin America, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

64.     Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd., a foreign corporation based in Osaka, Japan.

65.     Daikin America, Inc. is a developer and manufacturer of fluorochemical products, including fluoropolymers, fluoroelastomers, and fluorocarbon gas.

66.     Deepwater Chemicals, Inc. is a corporation organized and existing under the laws of Delaware, having a principal place of business at 196122 E. County Road 40, Woodward, Oklahoma 73801-5656.

67.     Deepwater Chemicals, Inc. manufactures specialty chemicals, including organic and inorganic iodine derivative products.

68.     On information and belief, Deepwater Chemicals manufactured specialty chemicals for defendant, Chemguard and/or other related Tyco entities, including products containing PFAS.

69.     ArcelorMittal Weirton LLC f/k/a ArcelorMittal Weirton, Inc. f/k/a Mittal Steel USA – Weirton, Inc. f/k/a ISG Weirton, Inc. ("ArcelorMittal") is a limited liability company organized under the laws of Delaware.

70.     ArcelorMittal owns and operates steelmaking and metal plating and related facilities in Weirton, West Virginia.

71.     ArcelorMittal's Weirton facilities are situated along the Ohio River in close proximity to the Weirton Water System, including Plaintiffs' supply well and Ohio River intake.

72.     On information and belief, at all relevant times herein and historically, ArcelorMittal's steel and/or metal plating operations involved the use of PFAS and/or products containing PFAS, including AFFF.

73.     On information and belief, wastewater, leaks, storage and disposal practices and/or other operations at ArcelorMittal's facilities in Weirton caused PFAS to enter and contaminate the Weirton Water System.

74.     Neo Industries, (Weirton), Inc. ("Neo Industries") is a Delaware corporation with its principal place of business in Indiana. .

75.     Neo Industries owns  and/or operates metal manufacturing and coating facilities, including, but not limited to, chrome plating, in Weirton, West Virginia.

76.     On information and belief, at all relevant times herein and historically, Neo Industries' operations at its Weirton facilities involved the use of PFAS and/or products containing PFAS, including AFFF.

77.     Neo Industries' facilities are situated in close proximity to the Weirton Water System, including Plaintiffs' supply well and Ohio River intake.

78.     On information and belief, wastewater, leaks, storage and disposal practices and/or other operations at Neo Industries' Weirton facilities caused PFAS to enter and contaminate the Weirton Water System.

## JURISDICTION AND VENUE

79.     The Weirton Water System, which is the subject of this lawsuit, is located in Brooke County and Hancock County, West Virginia.

80.     This action was commenced in the Circuit Court of Brooke County of West Virginia.  Defendants removed it to the District Court for the Northern District of West Virginia, Wheeling Division on the basis of diversity jurisdiction.

81.     By Order dated August 10, 2020, this Court denied Plaintiffs' motion to remand.

82.     This Court has jurisdiction over the Defendants because they do business in West Virginia and/or they caused injury and/or damages in West Virginia.

## FACTUAL ALLEGATIONS
### *Contamination of The Weirton Water System*

83.     The water sources that comprise part of the Weirton Water System are an intake on the Ohio River and the Ranney Well, a groundwater collector well on the bank of the Ohio River.

84.     Water from these water sources is combined and treated at the Weirton Water System's treatment plant located at 3031 Birch Drive, Brooke County, West Virginia.

85.     The water, intake pipe, collector well, treatment plant, and all associated piping, equipment and appurtenances are all part of the Weirton Water System.

86.     The Weirton watershed area consists of the Source Water Protection Area in and around its water system and the larger Zone of Critical Concern, which includes upland areas along the banks of the Ohio River and the river.

87.     On May 2, 2012 the United States Environmental Protection Agency ("EPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), which required public water systems nationwide to monitor for thirty (30) contaminants of concern between 2013 and 2015. The UCMR3 Rule included the requirement that public water systems sample for six perfluorinated compounds, including PFOA.

88.     In May 2016, the EPA lowered its health advisory level from for PFOS from 200 parts per trillion ("ppt") and 400 ppt for PFOA to 70 ppt for PFOA and PFOS combined. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33,250-51 (May 25, 2016).

89.     The EPA health advisory level was issued as a non-mandatory guideline.

90.     The State of West Virginia does not currently have a maximum contaminant level for PFAS.

91.      In sampling conducted on June 8, 2018, PFAS were found for the first time at detectable levels in the Weirton Water System.  Of these, PFOS was detected at 8.9 ppt and PFOA at 3.8 ppt in the drinking water sample at the water treatment plant.

92.     In sampling conducted on March 27, 2019, PFAS chemicals were first detected at the Ranney well pump tap of groundwater, at levels of 5.2 ppt for PFOA and 21.0 ppt for PFOS.

Various PFAS were also detected again at the lab sink at the water treatment plant, including at levels of 8.3 ppt for PFOS and 2.6 ppt for PFOA.

93.     On December 19, 2019, the EPA issued a Memorandum with Interim Recommendations stating "In situations where groundwater is currently being used for drinking water, EPA expects that responsible parties will address levels of PFOA and/or PFOS over 70 ppt."

94.     In view of the 2019 finding of PFAS in all water supply sources,  EPA's December 2019 interim guidance document, and growing public concern about these toxic chemicals in the drinking water,  Plaintiffs have begun to take action to address the contamination of the Weirton Water System.

95.     Such action includes, but is not limited to planning, designing, purchasing and installing equipment to filter and treat the water to remove PFAS, infrastructure modifications, contingency planning, and testing and monitoring to ensure the Weirton Water System provides clean and safe water to residences and businesses.

### PFOA and PFOS and Their Risk to Public Health and the Environment

96.     PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

97.     The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

98.     PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in

organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

99.     PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

100.     PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

101.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

102.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

103.     PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

104.     The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

105.     Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high

cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

106.    The injuries caused by PFAS can arise months or years after exposure.

**Defendants' Manufacture, Sale and Use of PFAS Despite Known Risks**

107.    In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

108.    3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

109.    Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

110.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

111.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

112.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

113.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

114.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

115.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

116.    In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

117.    In an attempt to limit liability, 3M Company opted to stop producing PFAS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

118.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of

injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

119.   3M Company did not comply with its duty under TSCA, and, in April 2006, it agreed to pay EPA a penalty of more than $1.5 million for, among other things, its failure to disclose studies regarding PFAS dating back decades.

120.   DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFAS, of which DuPont was aware.

121.   In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

122.   All of the Manufacturing Defendants manufactured, distributed, sold and promoted PFAS and products containing PFAS of various kinds and in various quantities.

123.   In 2006, eight major PFOA manufacturers, including many of the Manufacturing Defendants or their predecessors, agreed to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of toxic PFOA and related chemicals by 95% no later than 2010.

124.   The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

125.   On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 ppt and 200 ppt, respectively.

126.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

127.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

128.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Manufacturing Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

129.    Furthermore, Manufacturing Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

130.    At all relevant times, Manufacturing Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity,

and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

131.    At all relevant times, each of the Defendants knew, or should have known, that PFAS and products containing PFAS create a substantial risk of harm to public water supplies, including Plaintiffs' drinking water supply.

132.    Upon information and belief, each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**Defendants' Manufacture and Sale of AFFF/Component Products**

133.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

134.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

135.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

136.    Beginning in the 1960s, the Manufacturing Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

137.    AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals.  Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

138.    AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

139.    On information and belief, the Manufacturing Defendants designed, manufactured, marketed, distributed, and/or sold PFAS and/or products containing PFAS, including AFFF, which were discharged into the environment in and around Weirton, West Virginia during fire protection, training, and response activities, resulting in widespread PFAS contamination.

140.    On information and belief, Manufacturing Defendants' AFFF was used in various industrial facilities in and around Weirton, West Virginia, including at the Weirton Steel facility, currently operated by Defendant ArcelorMittal, and Ball Corp.

**PFAS is Fungible and Commingled in the Groundwater**

141.    Once they are released to the environment and groundwater, PFAS lack characteristics that would enable identification of the company that manufactured the particular batch of chemicals or products that contained the PFAS.

142.    The process of manufacture and distribution of PFAS and PFAS-containing products, including AFFF, sometimes includes complex arrangements whereby Defendants sell their chemicals or products through intermediaries.

143.     Surface waters, including the Ohio River, contain PFAS which originates from many different sources.

144.     Similarly, subsurface contamination of groundwater with PFAS can be caused by a variety of sources and facilities, including PFAS chemicals coming from different manufacturers.

145.     Because precise identification of the specific manufacturer or source of PFAS that may be detected in surface and/or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon the Weirton Water System.

146.     Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS from the public, including Plaintiffs, and to attempt to avoid liability for their contamination of drinking water supplies.

### FIRST CAUSE OF ACTION AGAINST THE MANUFACTURING DEFENDANTS:
### PRODUCT LIABILITY FOR DEFECTIVE DESIGN

147.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

148.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS and/or products containing PFAS, including AFFF, Manufacturing Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

149.     Manufacturing Defendants knew that third parties would purchase PFAS and/or products containing PFAS, including AFFF and use them without inspection for defects.

150.     PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Manufacturing Defendants were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of the Weirton Water System, including in the Ohio

River and the Weirton Area watershed.  Such discharges occurred at various locations, at various times, and in various amounts.

151.    PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Manufacturing Defendants, were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

152.    Manufacturing Defendants knew or reasonably should have known that the use of PFAS and/or products containing PFAS, including AFFF, in their intended manner would result in the spillage, discharge, disposal, or release of PFAS onto land or into water.

153.     PFAS and/or products containing PFAS, including AFFF,used in the vicinity of the Weirton Water System were defective in design and unreasonably dangerous for their intended use because, among other things:

a.    PFAS cause extensive and persistent surface and groundwater contamination when these chemicals, or products containing them, are used and discharged in their foreseeable and intended manner.

b.    PFAS contamination in drinking water poses significant threats to public health and welfare.

c.    Manufacturing Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

d.    There are and were safe or safer alternatives to PFAS and AFFF which Manufacturing Defendants could and should have employed.

154.    At all times relevant to this action, products containing PFAS, including AFFF, were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

155.     At all times relevant to this action, the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

156.     At all times relevant to this action, a reasonably prudent manufacturer knew or should have known of the significant dangers posed by PFAS.

157.     Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice.  Such conduct was performed to promote sales of PFAS and/or products containing PFAS, including AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

158.     As direct and proximate result of Manufacturing Defendants' defective and unsafe PFAS and/or products containing PFAS, including AFFF, significant PFAS contamination and damage to the Weirton Water System has occurred and will continue to occur in the future for years to come, causing the Plaintiffs to incur significant damage and injury.

159.     Manufacturing Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

160.     As a direct result of the foregoing, Plaintiffs seeks compensatory damages in an amount to be determined by a jury at the time of trial.

**SECOND CAUSE OF ACTION AGAINST THE MANUFACTURING DEFENDANTS:**
**PRODUCT LIABILITY FOR FAILURE TO WARN**

161.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

162.     As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS and/or products containing PFAS, including AFFF, Manufacturing Defendants had a strict

duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

163.     Manufacturing Defendants knew that third parties would purchase PFAS and/or products containing PFAS, including AFFF, and use them without inspection for defects.

164.     PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Manufacturing Defendants were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of the Weirton Water System, including the Ohio River and the Source Water Protection Area for Weirton.

165.     PFAS and/or products containing PFAS designed, sold and distributed by the Manufacturing Defendants were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

166.     Manufacturing Defendants knew or should have known that the use of PFAS and/or products containing PFAS, including AFFF, in their intended manner would result in the discharge, disposal, or release of PFAS onto land or into water.

167.     PFAS and/or products containing PFAS, including AFFF, used in the vicinity of the Weirton Area watershed and the Weirton Water System were defective in design and had a use defect and were unreasonably dangerous products for the reasons set forth above.

168.     Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS and/or products containing PFAS products, including AFFF, Manufacturing Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate those hazards.

169.     In particular, Manufacturing Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS and/or products containing PFAS, including AFFF,that now contaminate the Weirton Water System.

170.     As a direct and proximate result of Manufacturing Defendants' acts and omissions as alleged herein, significant PFAS contamination and damage to the Weirton Water System has occurred and will continue to occur in the future for years to come, causing the Plaintiffs to incur significant damage and injury.

171.     Manufacturing Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the Weirton Water System.

172.     At all times relevant to this action, a reasonably prudent manufacturer would or should have warned purchasers and users of the significant dangers posed by PFAS.

173.     Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice.  Such conduct was performed to promote sales of PFAS and/or products containing PFAS, including AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

174.     Manufacturing Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

175.     As a direct result of the foregoing, Plaintiffs seeks compensatory damages in an amount to be determined by a jury at the time of trial.

**THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS:**
**<u>PUBLIC NUISANCE</u>**

176.    Plaintiffs reallege and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.    The Weirton Water System provide drinking water to a large number of residents and businesses for drinking, bathing, cleaning, washing, and other uses.

178.    Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

179.    Defendants have designed, manufactured, formulated, marketed, promoted distributed, sold, supplied, used and/or discharged PFAS and/or products containing PFAS, including AFFF, in a manner that has created a public nuisance and that unreasonably endangers or injures the property, health, safety and comfort of the general public, causing injury, inconvenience and annoyance.

180.    Defendants, by their negligent, reckless and willful acts and omissions set forth above, have caused significant, long-lasting, and ongoing contamination of the Weirton Water System and the surrounding water supply.

181.    By their conduct, Defendants violated and/or endangered the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted surface and groundwater.

182.    Defendants' conduct has also injured the property, health, safety and/or comfort of a considerable number of persons.

183.    Defendants have taken no action to abate or remediate the nuisance.

184.    The harm or endangerment to the public health, safety and the environment is ongoing and will continue as long as PFAS chemicals remain at detectable levels in the Weirton Water System and until appropriate measures are put in place to remove these contaminants.

185.     As owners of the Weirton Water System and purveyors of drinking water, Plaintiffs have the obligation and responsibility to address the contamination caused by Defendants to the Weirton Water System.

186.     Pursuant to West Virginia Code Section 8-12-5, Plaintiff, the City of Weirton, has the authority to bring this action to abate the public nuisance caused by the contamination of the Weirton Water System.

187.     Plaintiffs have incurred and/or will incur special injuries and/or injuries that are different in kind from those incurred by the general public in connection with the aforesaid contamination including: investigative costs, additional testing costs, treatment costs, infrastructure costs, contingency planning, and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the Weirton Water System has been rendered less certain, safe and reliable.

188.     Plaintiffs also have and will continue to incur attorney fees related to cost recovery efforts and/or potential third-party liability.

189.     Defendants knew or, in the exercise of reasonable care, should have known that their acts and omissions, described above, would and have unreasonably and seriously damage, endanger, and interfere with the ordinary comfort, use and enjoyment of vital surface and groundwater resources utilized by Plaintiffs and relied upon by the public.

190.     As a direct and proximate result of Defendants' acts and omissions which created the above-described nuisance, the public has suffered annoyance, inconvenience and injury, and Plaintiffs have suffered special injuries different in kind than those of the public from actual and continuing contamination of the Weirton Water System.

191.    The gravity of the environmental and human health risks created by Defendants' conduct and Defendants' concealment of the dangers to human health and the environment far outweigh any social utility of Defendants' conduct.

192.    Defendants are jointly and severally liable and subject to injunctive relief prohibiting the creation and continuation of said nuisance, and Plaintiffs are entitled to abate the nuisance and all direct and consequential damages as described herein.

193.    Defendants also are liable for any other relief that will abate the nuisance and its short-term and long-term effects.

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS: <u>NEGLIGENCE</u>

194.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

195.    Defendants owed Plaintiffs a cognizable duty to exercise reasonable care in designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing unreasonably dangerous chemicals such as PFAS and/or products containing PFAS, including AFFF.

196.    Defendants breached this duty by negligently putting PFAS into the stream of commerce, including in and around the Weirton Area watershed, even when they knew or should have known about the dangers PFAS posed to water.

197.    Defendants had a duty to adequately and timely warn federal, state, and local regulators and authorities, Plaintiffs, and the public, of the presence of and threats posed by releases of PFAS into the environment and, especially, its presence in water.

198.    Defendants also had an affirmative duty to remove and remediate the PFAS contamination from surface water and groundwater, including in the Weirton Water System and Weirton Area watershed in the vicinity of the Weirton Water System.

199.    Defendants breached each of these duties and failed to provide any warnings or take any action to prevent, mitigate or abate the harm caused by their products.

200.    Defendants' past and continuing breach of their duties is the direct, sole and proximate cause of substantial and continuing harm to Plaintiffs and the Weirton Water System and of Plaintiffs' damages.

201.    Plaintiffs' damages were reasonably foreseeable as resulting from Defendants' tortious conduct and omissions, as described above.

202.    Defendants are jointly and severally liable for all such damages.

203.    As a direct result of the foregoing, Plaintiffs seek compensatory damages in an amount to be determined by a jury at the time of trial.

### FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS:
### <u>NEGLIGENCE PER SE</u>

204.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

205.    Defendants owed a duty to Plaintiffs to conduct their business in a manner that would not violate applicable legal requirements, including West Virginia's Water Pollution Control Act, West Virginia Code §22-11-1 et seq, West Virginia's Groundwater Protection Act, W.Va. Code§ 22-12-1 et seq., West Virginia's Solid Waste Management Act, W.Va. Code §§ 22-15-1 et seq.

206.    The above statutes are intended to protect the health, safety and welfare of the public, protect West Virginia's natural resources, including surface and groundwater and soil, and maintain reasonable standards of purity and quality of these resources.

207.    Plaintiffs and the residents of Weirton, who rely on its water system, are protected by the above statutes.

208.    Defendants' acts and omissions described above have caused and continue to cause past, present, and continuing violations of the above statutes and constitute negligence per se and/or prima facie negligence.

209.    As a direct proximate result of Defendants' statutory violations and negligent, wanton, and reckless acts or omissions, as described above, the Weirton Water System has been contaminated by PFAS, and Plaintiffs have suffered and will continue to suffer damages as described herein.

210.    Defendants are jointly and severally liable for all such damages.

211.    As a direct result of the foregoing, Plaintiffs seek compensatory damages in an amount to be determined by a jury at the time of trial.

### SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS:
### TRESPASS

212.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

213.    Plaintiffs own and possess the Weirton Water System and Plaintiffs exercise their rights to appropriate and use water within the Weirton Water System, including the Ramey well and water drawn from its intake on the Ohio River.

214.    Plaintiffs did not give any Defendant permission to cause PFAS to enter the Weirton Water System.

215.    Defendants knew or reasonably have known that PFAS have a propensity to migrate in surface and groundwater aquifers when released to the environment; are mobile and persistent groundwater contaminant capable of moving substantial distances within aquifers; are toxic to human health; and are, therefore, hazardous to drinking water systems and human health.

216.    Defendants intentionally manufactured, promoted, marketed, distributed, sold, stored, used and/or discharged PFAS and/or products containing PFAS, including AFFF.

217.    Defendants knew or reasonably should have known that their actions would result in the discharge and release of PFAS into the environment, including within the Weirton watershed, and that these chemicals would intrude upon, contaminate, and damage the Weirton Water System.

218.    Defendants' actions and omissions were intentional and/or were done with reckless disregard to Plaintiffs' possessory interests.

219.    Defendants' tortious conduct constitutes a continuing, unauthorized intrusion and a continuing trespass onto the Weirton Water System, causing past, present and future damages to Plaintiffs.

220.    Defendants' actions were voluntary and were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs and Plaintiffs' customers' rights, health and property.

221.    Each Defendant is a substantial factor in bringing about the contamination of Plaintiffs' Water System, and each Defendant aided and abetted the trespasses.

222.    Defendants are jointly and severally liable for all of Plaintiffs' damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

223.    As a direct result of the foregoing, Plaintiffs seek compensatory damages in a sum to be determined by a jury at the time of trial.

## SEVENTH CAUSE OF ACTION AGAINST THE DUPONT DEFENDANTS:
## <u>FRAUDULENT TRANSFERS</u>

224.    Plaintiffs reallege and reaffirm each and every allegation in the preceding paragraphs as if fully restated herein.

225.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UFTA") against E. I. DuPont de Nemours and Company, The Chemours Company, and The Chemours Company FC, LLC, (collectively the "the DuPont Defendants").

226.    The UFTA was adopted, with minor changes, by a majority of states.  In West Virginia, it is implemented through the Uniform Voidable Transactions Act (W. Va. Code § 40-1A-1 et seq.) ("UVTA").

227.    In Delaware, which is the state of incorporation of the DuPont Defendants and the location of their executive offices, the UFTA provisions were adopted in the Delaware Uniform Fraudulent Transfer Act, 6 Del Code. 1301 et seq. ("DUFTA").

228.    Pursuant to UVTA and DUFTA:" (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor: (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should have believed that he or she [the debtor] would incur, debts beyond his or her ability [the debtor's] to pay as they became due."

229.    The DuPont Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) were engaged or were about to engage in a business for which the

remaining assets of the corporations created by them were unreasonably small in relation to the business; or (c) intended to incur, or believed or reasonably should have believed that the new corporations would incur, debts beyond its ability to pay as they became due.

230.    For decades, E. I. DuPont de Nemours and Company ("DuPont") manufactured, marketed, distributed and/or sold PFAS and/or products containing PFAS with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate drinking water supplies.

231.    DuPont concealed this knowledge from the EPA, state agencies and the general public.

232.    By the early 2000s, the environmental and human health risks posed by PFAS began to attract national attention, and DuPont became involved in litigation, EPA enforcement actions and remediation costs.

233.    As described above, in July 2015, DuPont completed a spinoff of its Performance Chemicals division to Chemours, including the fluoroproducts and chemical solutions businesses that had manufactured and discharged PFAS.

234.    As part of the spinoff, DuPont caused Chemours to assume a large portion of DuPont's historic liabilities, including environmental liabilities related to PFAS and to indemnify DuPont for claims related to such liabilities.

235.    In addition, as part of the transfer, Chemours paid DuPont a $3.9 billion dividend, which payment Chemours financed by taking on the same amount in debt.

236.    At the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation against DuPont for damages and injuries from the manufacturing, marketing, distribution and/or

sale of  PFAS and/or products containing PFAS.  DuPont's past PFAS-related expenditures and present and reasonably anticipated liabilities and obligations were in the hundreds of millions.

237.    At the time of the above transfer, DuPont and Chemours believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay as they became due.

238.    Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of DuPont's liabilities.

239.    In 2017, Chemours and DuPont amended their separation agreement to address the sharing of liabilities for claims arising from environmental releases of PFAS from the Washington Works Plant near Parkersburg, West Virginia, as well as potential PFAS liabilities that might arise in the future.

240.    At all times relevant to this action, the claims and potential judgments against Chemours potentially exceed Chemours' ability to pay.

241.    In the subsequent restructuring that created Corteva and New DuPont in 2019, these new companies also took on DuPont's historical liabilities for PFAS contamination and remediation.

242.    By this time, multiple additional lawsuits had been settled and were pending regarding the above liabilities.

243.    By virtue of the above transfer of assets and liabilities, the Dupont Defendants have attempted to limit the availability of assets to cover judgments for all of DuPont liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of PFAS and/or products containing PFAS.

244. Pursuant to UVTA and DUFTA and any other applicable law incorporating the UFTA provisions, Plaintiffs seek avoidance of the transfers of DuPont's assets and liabilities to the extent necessary to cover the claims brought in this Complaint.

245. Plaintiffs further seek all other rights and equitable remedies that may be available to them pursuant to the above statutes, including prejudgment and provisional remedies, as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered, and any other relief the circumstances may require.

## PUNITIVE DAMAGES

246. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully stated herein.

247. At all times relevant to the present cause of action, Defendants designed, manufactured, marketed, sold, stored, used, and/or discharged PFAS and/or products containing PFAS, including AFFF, that resulted in the contamination of the Weirton Water System.

248. At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFAS would and/or could be introduced into the environment, surface water, and/or groundwater causing contamination of the Weirton Water System.

249. Defendants caused an unknown quantity of PFAS to be released into the environment, surface water, soil, and/or groundwater, threatening and impacting the Weirton Water System.

250. The Defendants actions were intentional, willful, wanton and with actual malice, include but are not limited to, Defendants failing to issue warnings and failing to divulge material information concerning the harm caused by PFAS in the environment and human health, especially

in water, despite knowing of the probability of long-lasting water contamination, including specifically high risks to aquifers and groundwater posed by PFAS and/or products containing PFAS, including AFFF.

251.    Defendants' intentional, willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, Defendants' failure to take all reasonable measures to ensure that PFAS would be effectively disposed of and not discharged into the surrounding environment where it would inevitably contaminate water, including the Weirton Water System.

252.    Defendants have caused great harm to Plaintiffs, who have incurred and will continue to incur costs in responding to the contamination from PFAS and will incur future costs, including but not limited to, investigative costs, engineering costs, treatment costs, sampling and monitoring costs, and legal costs.

253.    Defendants have demonstrated an outrageous conscious disregard for the environment and acted with implied malice and oppression, warranting the imposition of punitive damages.

254.    Furthermore, Defendants acted in the foregoing manner with conscious disregard for the safety and rights of Plaintiffs and residents of Brooke and Hancock Counties and their natural resources, which actions had a great probability of causing substantial and continuing harm.

255.    The releases of PFOA were the result of intentional, willful and/or malicious conduct within the privity and/or knowledge of Defendants, and were caused, among other things, by Defendants' violations of applicable environmental, safety or operating standards, regulations or laws.

256.    As a direct and proximate result of Defendants' intentional, willful and malicious conduct, Plaintiffs are entitled to recover punitive damages.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, City of Weirton and Weirton Area Water Board, pray for judgment against the Defendants, jointly and severally, as follows:

(A)    All compensatory damages allowed by law and in an amount to be determined by a jury;

(B)    Damages for injury to Weirton's natural resources, including the economic impact to the Plaintiffs and Weirton area residents;

(C)    An award of all present and future costs to treat and/or abate the existing and future PFAS contamination complained of herein;

(D)    A declaration of Defendants' duty to indemnify Plaintiffs for all expenditures of money that they reasonably undertake in connection with the PFAS contamination;

(E)    Avoidance of the transfers of DuPont's assets and liabilities to the extent necessary to cover the claims brought in this Complaint, together with all other rights and equitable remedies, and any other relief the circumstances may require.

(F)    Punitive damages;

(G)    Pre-judgment and post-judgment interest as provided under the law;

(H)     Costs and attorney fees expended in the prosecution of this matter, if permitted;

(I)    All such other relief as the Court may deem just, proper and equitable.

## <u>PLAINTIFFS REQUEST A TRIAL BY JURY</u>

Respectfully submitted,

**WEIRTON AREA WATER BOARD AND THE CITY OF WEIRTON, Plaintiffs**

 */s/ Mark A. Colantonio*
Mark A. Colantonio
Clayton Fitzsimmons
FITZSIMMONS LAW FIRM PLLC
1609 Warwood Ave.
Wheeling, WV 26003

Tel. (304) 277-1705
clayton@fitzsimmonsfirm.com
mark@fitzsimmonsfirm.com

_____

Lilia Factor (*pro hac vice*)
Paul Napoli (*pro hac vice*)
Andrew Croner (*pro hac vice*)
NAPOLI SHKONIK, PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Tel: (212) 397-1000
lfactor@napolilaw.com
pnapoli@nsprlaw.com
acroner@napolilaw.com